And if you could call the case, please. Okay, counsel, we're going to argue please approach. Tell us who you are. My name is Linda Olthoff, and I represent Andrew Solomon from the state of Howard defender. Morning, your honors, Assistant State's Attorney Tyler Michaels on behalf of the people of the state of Illinois. Okay. Um, we've read the briefs and are fully familiar with the legal issues. Should mention that our colleague, uh, Justice Smith, may not be here today because of a personal medical issue involving a family member, but he is fully, you know, up to date on everything. And we'll consider the arguments, uh, when he's able to do so in the coming days. And he's going to listen to the audio. Yeah. All right, go ahead and proceed. Thank you, your honors. From the time of his arrest until he made a statement, Andrew Solomon was left in a locked room, handcuffed to a wall for 25 hours, while the police denied him access to a phone call and kept him in isolation from the outside world, rendering his subsequent statement involuntary. The facts here generally are not in dispute. The trial court found that upon his arrest, Andrew invoked his right to counsel and asked for a lawyer, or asked for a phone call. Um, the trial judge found that he had been, um, kept isolated from the world, did not get his phone call, but, and that the police testified that there was a policy not to give a phone call until they were processed. A policy in area two. Correct. Did, was anything else done that would add to anything, uh, anything else done that would be arguably coercive? Did they say anything? Did they do anything? Did they turn off the lights? Did, you know, they provoke anything? Or was it just that he was in this room and then intermittently was given food, water, contact lens solution, et cetera. Right. He was left in this locked room for 25 hours, asking for a lawyer, asking, um, for a phone call. When he asked for a lawyer, at least two of the times that he asked for a lawyer, the police just left him alone. They walked up, they left him alone. Right. And, um, when he asked to make phone calls, is there any, they didn't connect making a phone call to making a confession. They just said, you'll have to wait. Correct. Right. And what exactly did they testify? Is the, was the policy in area two at that time? That they wait until the, um, suspect goes through the booking process. Booking process. I'm sorry. The, the date of this was in, uh, November of 11, right? Correct. But that was not the first time he was in the police station where the police wanted to talk to him about what had happened. Right. What, what happened the first time around? How did, how did, uh, how was he contacted? How did he get there? What happened? Uh, he was, uh, the police called him, um, tried to, there was some miscommunication about where he lives. So he came down to the station, um, indicated he wanted an attorney. Um, and they said, um, they asked him to take a polygraph and he refused and they let him go. And what about his buddy Polo? Apollonio or whatever, what, what was, was he involved at all in, uh, that particular event where defendant went to the police station? Yes. Um, his statement is a little, or his testimony is a little bit different than the police and Andrews. And he said, you know, he was in the station for approximately four hours and came out, you know, very upset. Um, but according to Andrew, Andrew Solomon and the detectives, uh, their testimony at the motions press, it was just kind of a quick, um, encounter. But is it, is it accurate to say that, uh, before he went to the police station, defendant had a conversation with his friend that his friend testified to in which he was feeling bad about something that had happened that he felt he might be responsible for? Uh, his friend did testify that that occurred, that he, that there was a conversation. Okay. So when, when he comes back a year later, this is, you know, he already has some quote history with this event and with these, uh, the same police officers, right? Right. Okay. Um, yes. And I would say that this time it's a very different, I mean, he expected, you know, the first time they respected his, uh, request for counsel, um, let him go. And this time he's kept isolated in a locked room for a very long time. Um, and also this time, nobody knew where he was. This is another significant aspect of this case. He was stopped in his car on his way home from work. It wasn't like he was picked up at his home or somebody knew the police were taking him. He was there all alone, knowing that nobody knows where I am. I'm here at the hands of the police. Um, they have all the power. I'm powerless and I want a phone call and he's not getting a phone call. Um, this is not, and this is not a situation where he's just asking for a phone call, um, because he wants moral support or wants a family member or friend present when he's in custody. He's asking for a phone call to access his constitutional right to counsel. Um, and, um, long ago at the Illinois Supreme Court has said in People versus Prim, the purpose of this statute, which requires a phone call be given within a reasonable amount of time once in custody is so that a suspect can access his procedural safeguards, including the right to counsel. Um, and here that wasn't done. Every time the police talked to him, they Mirandized him again, right? Yes. Including the last time that he spoke to us. And then he re-initiated contact with the police at that point. Is that correct? Right. Right. And we're not suggesting that this is a Miranda violation. We're saying that he being left locked from the outside world without a phone avenue to access his constitutional right to a lawyer rendered his statement involuntary. No, there's no testimony that anybody said to him, you're not getting a phone call until you confess or anything like that. Nobody said that explicitly. Um, well, did anybody say anything that would be even arguably implicit in that regard, or did they just not say anything? The record doesn't, isn't clear as to exactly what, um, what they might've said. If you look at, I think what is instructive here is the, uh, U.S. Supreme Court case in Keeble versus Haynes, which talked about the coercive impact, um, the situation can have when you're left in complete isolation without access to a phone call. And there, the, um, the police did tie the phone call up to making a statement. Whereas if we don't have that here, but the court did say even absent an express threat, um, the coercive nature of being held in isolation cannot be understated. It cannot be negated by his experience with the police, um, prior experience or prior statements he may have had. Um, so even apart from any expressed threat, the United States Supreme Court said long ago, um, that the secret and incommunicado detentions, um, There was a little something more there. Wasn't it the fact that the police told him that his access to a telephone would be contingent upon his cooperation with law enforcement? Yes, but it does go on to say even absent an express threat, this is a coercive device used to extract confessions. And a lot can be inferred even by what is not said. We often infer from silence, um, he's there for 25 hours, 24 hours. What does he, he, he knows what the police are waiting for. What, of course they're waiting for a confession. Why else would they not let him have a phone call? Why else would they not call a lawyer? It's, it's not hard to figure out. This is what they wanted from him. But again, this is not his first time being involved with this. He was there a year before he went over with a friend of his and his friend testified that he indicated that he was involved and, you know, he knew what the police were looking for. Right. He knew that they were looking for a statement the last time they let him go without it, um, when they asked for a lawyer this time, nobody knows, at least last time his friend knew he was there and knew if he was going to stay there for a while, he could tell family members, get a lawyer, nobody knew he was there. How is he going to get a lawyer? This is a, the police violated, flagrantly violated, the statute was meant to protect. They, they, they may have violated it simply by not giving him what he asked, uh, when he asked for it. But I don't know that there's a case out there that indicates that there's a specific amount of time that it's black letter law, that that would be in and of itself, coercive. Do you have a case that says that? That not giving a phone call is in and of itself coercive. I don't have a case exactly that says that. I think the closest is this court's case, um, holding in people versus Sanchez, where defendant was not allowed a phone call for 10 hours, I believe. There's 12, but even in there, they, the detectives told the defendant that he couldn't call his mother until he told them the truth about the shooting and they told him that they already knew that he shot the victim. I mean, that kind of stuff, uh, has coercive, uh, written all over it. And I just don't see that here in this record. I think there are different types of coercion that police can implement, implement, you know, there's, they know the videotape is running, so they can't be explicitly coercive. Any explanation for why the whole videotape is not been available as evidence only the part about the confession? Um, the attorney, the initial attorney on the case attempted to obtain it and it was not in working order and she wasn't, we, our office tried to get it. Um, it was not, but it was not before the trial court either. It was just the statement. Right. Um, yeah, I've got this thing running for 24, 25 hours. So when we get 15 minutes of it, right. Right. Well, and so the fact that it is running, that they are going to be a little more creative, um, and they're not going to explicitly tell him, you know, you can't have a phone call. You can't have a lawyer. We're going to tie it to this, but okay. I think we, we, we're familiar with what your argument is on that issue, but what about the, uh, other factors here and whether or not, uh, this was, you know, effectively, uh, would be harmless error given the, uh, other information, the identification in the photo array by the third person who was supposed to be involved and then withdrew and also the statements that were made to his friend Polo. Well, I think again, Sanchez is instructed because there it said, um, you can talk about the exceptional persuasive force that a statement has. And while Polo made a statement that, oh, he talked to me, he told me some things that happened that is not as powerful as a signed handwritten statement to an assistant state's attorney. Moreover, the statement given to Polo had some questions in it. I mean, he said, oh, Andrew told me they ransacked the place. There was no evidence that the place was ransacked at all. He did not give details about when this happened, um, where it happened, the bar that had happened. So there were some details lacking that a jury would find questionable. And yes, you have, um, the third person that was initially involved in this. Of course, he's going to do whatever he can to extricate himself from the, from any involvement. He had never met Andrew Solomon before. Maybe he got the wrong guy. The jury could find that he got the wrong guy. The other guy, Jackson's right, but he had not met Andrew. And that's a word I was looking for in the record and the briefs co-defendant, whatever happened with Mr. Jackson. From what I can tell is he was never charged. Um, and that's just from looking at the clerk's computer, but it's not in the record. Um, so I don't think he was ever taken in. So Solomon's on accountability. Correct. Yes. And the evidence that came out of trial, Jackson was the, um, the primary offender that, you know, that killed the person. Is he dead? Was Jackson dead? I don't know. I don't know. Um, can you just talk for a few minutes about, uh, re-initiating with the police? He bangs on the door, he's crying, he's pounding on the door. Right. He says, I want to talk to, I want to talk to the detective. Isn't that an okay re-initiation? Well, he's clearly in distress. He's crying, he's banging on the door. Um, I would expect somebody in jail to be in stress, to be a suspect to be in stress, but there's abundant case law about re-initiating contact. He was also re-Morandized when they opened the door after he started pounding on it. Tell me why that's not a voluntary confession. I would say that his re-initiation was not voluntary. He was at this point trying to get out of the room. He, this was his only way to get out of that room and off of the, away from the handcuffs, which was his only way to get back to access. I mean, for all he knew, he wasn't going to have access to anybody, um, until he made a statement and Haynes again, has that powerful language that a person has no reason not to believe that the police are not going to continue this indefinite, prolonged detention, unless you give them what they want. Of course, Andrew knew what they wanted, even if they don't explicitly say it. Um, so clearly, they had said it the year before when they brought him in. Right. He wanted a lawyer and he has a basic core fundamental constitutional right to have an attorney present. And the statute wasn't active to provide an avenue, um, to that constitutional right. Um, so he, his Miranda, his re-initiating, everything becomes meaningless when he doesn't have the attorney that he has asked for. Um, we, I don't think you can lose sight of the, you know, flagrant violation of the statute. The statute is there for a reason and it implicates constitutional rights. Let's also look at the, this was inexplicable. Why did they need to leave him in a room for 25 hours? Why did they have to wait for the booking process? Why did the booking process take 25 hours? Why are we relieving the state and the police of their burden to follow the statute and to follow the law just because they didn't say certain magic words to try to coerce him when this coercion could clearly be implicit and probably obvious to Andrew at the time. Um, nobody knew where he was. He was in this locked room, handcuffed to a wall. Um, and as a result, his initiation, re-initiation and his subsequent statement cannot be deemed voluntary. And I actually cannot, you asked for a case earlier, I can't think of a more egregious violation of the statute in, um, in any of our cases other than maybe Sanchez, which is the closest one. And here again, he was not with the physical characteristics, um, his intelligence, these things are really not relevant. He has no matter how strong, how smart, how old he is, he has a constitutional right to a lawyer, which was not respected in this case. So for those reasons, we would say that his statement was involuntary and asked this court to reverse the conviction. Thank you. Good morning, your honors. Again, assistant state's attorney, Tyler Michaels on behalf of the people of Illinois, in this case, the people argue that under the totality of the circumstances, the trial court was correct when it denied defendant's motion to suppress his confession. We ask that you affirm defendant's conviction for first degree murder. I would like to begin by pointing out that section 103-3A by itself does not provide defendant with an independent basis for suppressing his confession. First, as this court has pointed out recently in both people v. Sanchez and people v. Williams, section 103-3A by its own terms contains no remedy for a violation of the statute would implicate a confession's admissibility. It certainly knew how to include such language. In the immediately preceding statutory section, section 103-2.1, the legislature specifically included several instances where an unrecorded confession would be presumptively inadmissible. However, in section 103-3A, the legislature included no such language. The people's position on that is not only consistent, is not only sound as a matter of statutory interpretation, but it is also consistent with this court's jurisprudence. For example, in people v. Sanchez, this court found a violation of section 103-3A. However, the only remedy that this court found was to, quote, recommend the consideration of possible sanctions against the police officers. This was in recognition that it is the responsibility of the legislature to provide for any remedy for a violation of the statute. Instead, the relevant legal inquiry is whether a defendant's statement was voluntary. The question is whether a defendant made the confession freely, voluntarily, and without compulsion or inducement of any sort, or whether a defendant's will was overborne. There are a number of well-settled factors that courts look to in order to answer that question, and one of the factors defendant relies upon in this case is the duration of the detention. In this case, defendant was detained for approximately 24 hours from the time that he was placed into the interview room pending first-degree murder charges until the point that he re-initiated contact with police. What does pending first-degree murder charges mean? Your Honor, in this case, the police testified that they have to wait for the felony review unit in the state's attorney's office to- And they only come around once every 24 hours. Your Honor, the record is not entirely detailed on what exactly that process entailed. However, like I said, the police in this case were essentially waiting for that. And they also said that in Area 2 in 2011, it was their practice not to let anybody have any phone calls until after they were booked. What good does it do after they're booked? Well, Your Honor, that is the practice at Area 2. That is what the officer testified. It was in 2011? I'm not asking if it still is. I'm just saying 2011. I'm not sure about whether it still is or not. I do know that the officers did testify that that was the practice back then, so these two things kind of went hand in hand. So 24 hours in a chair, chained to a hook in the wall, given the opportunity to have something to eat, something to drink, go to the bathroom, nowhere to lay down, nowhere to rest. Well, Your Honor, actually, on that point, it's important to detail what happened within that 24 hours. Defendant was given food. He was given snacks. He was given a meal. He was given water. He was given soda. He was given cigarettes. He had an issue at one point with his contact lens, and one of the police officers took defendant to the bathroom and assisted him until that issue was resolved. With respect to the handcuffs, for the most part, during his detention, defendant was handcuffed to a wall. It was one arm handcuffed to a ringlet, which was approximately three to four feet above the ground, and it was positioned above a long bench. And in fact, the testimony at trial indicated that for most of the one-night defendant spent in the interview room, he was observed to be sleeping on that bench. And further, the police officers testified... Any testimony about why he needed to be handcuffed when he was in a locked room? Well, police officers testified that occasionally when they enter a room, they get attacked. And so that was their testimony, and so they did it for, one, their protection, and also they testified that it's for defendant's protection as well. Defendant did have one arm handcuffed to a wall. His other hand was free, and this is potentially to protect defendant from hurting himself as he was in there pending a very serious charge. With all of the evidence that was amassed in this case from the Santos, I think his name was, who was supposed to be the third person involved, from Polo, in the confession that was given, the statement that was given by the defendant. There's a lot of information in here about this fellow named Jackson. Yes, Your Honor. Your Honor, the record is... Where was he, when was he taken in? When was he put, when was he chained to a wall for 24 hours? Your Honor, I'm not sure. The record does not disclose what occurred with Raymond Jackson. It would be a matter of speculation for me to opine on that. Salmon was accountability. He was the driver. He was the driver. There was also testimony that indicated that defendant had hit the victim as the victim was attempting to flee. There's also testimony that Jackson hit this defendant with a lead pipe. So the testimony at trial indicated that victim attempted to flee and ran towards defendant, and defendant was told by Raymond Jackson to punch the victim. They said he did it because he didn't want to act like, if he did it, he didn't want to act like a bitch, right? Yes, I believe that during his confession, the defendant did not testify to some of those inculpatory elements. However, as you said, with respect to the confession that defendant gave to Apollonio Rattama, his friend, who testified at trial, he did indicate that he hit the victim as the victim was trying to flee. And for that reason, even if this court were to find that the statement was involuntarily made, this court could still rule that it was harmless error, where Apollonio Rattama, his friend, did testify at trial to having heard the defendant admit to the murder of the victim. And what if he didn't have the confession? Yeah, well, if we didn't have the video recorded confession? If we didn't have the video recorded confession, we would still have Apollonio Rattama's third-party confession that was given to him by defendant.  And if we didn't have the video recorded confession, we would still have Apollonio Rattama's third-party confession that was given to him by defendant. Would you agree that the consent decree is a public document available to this Court? I'm not sure on that, Your Honor. Well, the City of Chicago recently signed a consent decree, and phone calls by people who are arrested, people who are suspects, is an issue in the consent decree. Now, that's hindsight. The consent decree wasn't issued until last year. We're talking about 2011. So I'm thinking to myself that by 2019, it was still so important that the Justice Department and the City of Chicago had to discuss it, that somebody somewhere along the line recognized that this is a serious issue and that we must take it seriously as well. Twenty-four hours without a phone call with repeated demands for a phone call. There's a right to a phone call. The statute gives him a right to a phone call. Even if he had no experience with the police department, just television tells you that you have a right to a phone call. He was walked back and forth to the bathroom a couple times. There's presumably some phones in the police station. He's demanding a phone call. What's the problem with just letting him make a phone call before it's too late? After he's booked, what good does it do him? Your Honor, on that specific point, the only response defendant ever testified to receiving upon his multiple requests for a phone call was not right now. As far as the police, the police testified that their standard procedure at the time was to wait until after the booking process. And they could not, this is their testimony, they could not book defendant until they had the Felony Review Unit within the State's Attorney's Office approve those charges. Felony Review Unit is 24-7, right? Your Honor, I'm not aware of the hours. You don't think Felony Review was available in Area 2, one of the high crime areas of Chicago? Your Honor, I do believe that they were available. I'm not sure. Your Honor, as I said, the record is not fleshed out as to why the Felony Review Unit- Would you say when the police called Felony Review? Again, I'm not sure if they did or did not. The record does not indicate one way or the other if Felony Review was contacted or not. The implication from their testimony would be that Felony Review Unit was contacted since they were awaiting approval of the charges. And then at that point, they could have booked defendant and defendant, under their protocol, would have been provided with a phone call. But ultimately, applying the relevant factors under the totality of the circumstances, the people argue that there is insufficient evidence, in this case, to hold that defendant's will was overborne by police coercion. The defendant was 25 years old at the time of questioning. He appeared to be in fine physical condition. He was a high school graduate. He had a job. He did have a job. In fact, he was arrested leaving that job, so he was able to work. While giving his confession, he appears alert and articulate. People made no threats or promises whatsoever. Except you'll have to wait. For a phone call, yes, he would have to wait. And it wasn't you'll have to wait an hour, you'll have to wait two hours, you'll have to wait six hours, you'll have to wait. It could have been forever. You'll have to wait three days, you'll have to wait five days. He didn't know. There was not a specific time that the police attached to when he would receive a phone call. And again, according to the police, it would have been after he was booked. But there were no threats or promises made, like in Sanchez, where we'll only give you a phone call if, you know, if you can get out. Well, every time he's taken out to the bathroom, he's led back into the cell and handcuffed again to the wall. Yes, Your Honor. And as the police testified, this was for officer safety as well as defendant safety. And like I said, the defendant was able to sit on the bench. And from the testimony induced at trial, he was able to sleep despite the handcuff while laying on the bench. Can you tell me about the reinitiation part of this argument? Yes, Your Honor. Defendant was banging on the door when Detective Moriarty entered the room. The defendant told, relayed to Detective Moriarty, I would like to speak with Detectives Thompson and Gillespie, who were the detectives that he had been dealing with, you know, since November of 2010, up to the date of his confession, which was November 2011. So police officers reentered the room. They asked, we know you invoked your right to counsel already. Are you sure you want to talk to us? Defendant responded affirmatively. Defendant was remirandized. He acknowledged, as the trial court found, he acknowledged those rights, and he decided to confess. And moreover, during the entire period of his detention, since defendant almost immediately invoked his right to counsel, and police ceased all questioning at that time, he was not subject to persistent questioning, which distinguishes it significantly from, say, people v. Sanchez, with round-by-round police questioning of that sort. Defendant did not have any of that. So under these circumstances, the people argue that the trial court was correct when it ruled the defendant's statement was not taken in violation of the Constitution. If there are no further questions, we ask that you affirm defendant's conviction for first degree murder. Thank you. Thank you. Just a few things. As far as the not being an independent basis or a remedy in the statute, this statute is intertwined with the constitutional right. And when a statement is involuntary, the remedy is suppression. And in fact, in determining whether the statement was voluntary in Sanchez, Sanchez noted the most notable factor was that he was not given a phone call and even suggested maybe sanctions should be imposed. And in that case, the phone call was just to call his mother. It wasn't even to access his right to counsel. Moreover, the procedure and practice of the police department does not and cannot trump a statute. The statute says that a reasonable number of telephone calls must be given within a reasonable time after arrival to the place of custody. It's the time of custody that triggers his right to a phone call, not the booking process, not whenever the police procedure suggests that it should be. And in fact, when you brought up the consent decree, similarly the police have now started putting signs in the police station to advise suspects that they have a right to a phone call and that there's an attorney on call that they should be able to access. The fact that he was given food and water, handcuffs, he's able to sit on a bench, may be able to sleep, does not negate the coerciveness of being held in a locked cell for 12, 25 hours. I don't think any of us could imagine not having experience with police or being interrogated that that would be an easy process. And finally, as far as it being harmless, remember it must be harmless beyond a reasonable doubt. And the nature of a confession is so strong and so persuasive to a jury that cannot be set here at work. The other statement is a hearsay statement made to his friend with some inconsistencies of what came out of trial and the statement and identification of co-defendant or person that wasn't previously involved. So for these reasons, we suggest that this was an involuntary statement. The reinitiation was also involuntary and must be suppressed and asked that this court reverse. Okay. The court would thank both parties for the arguments and for the briefs. We appreciate it. We'll take it under advisement and be back to you directly. Thank you. We're adjourned.